UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CATHERINE A. MAHONEY,
    Plaintiff,

V.                                  CIVIL ACTION NO.
                                     18-11593-MBB

WELLS FARGO BANK, N.A.,
    Defendant.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT WELLS FARGO BANK, N.A.'S MOTION TO DISMISS**
**(DOCKET ENTRY # 10); PLAINTIFF CATHERINE A. MAHONEY'S**
**MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT (DOCKET**
**ENTRY # 50); DEFENDANT WELLS FARGO BANK, N.A.'S MOTION TO**
**DISSOLVE PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE,**
**TO REQUIRE PLAINTIFF TO POST BOND AND MAKE**
**SECURITY PAYMENTS (DOCKET ENTRY # 30)**

**March 29, 2021**

BOWLER, U.S.M.J.

Pending before this court is a motion to dismiss (Docket Entry # 10) filed by defendant Wells Fargo Bank, N.A. ("defendant" or "the bank") under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") and a motion to dissolve a preliminary injunction or, in the alternative, to require plaintiff to post a bond and make security payments (Docket Entry # 30) also filed by defendant. Plaintiff Catherine A. Mahoney ("plaintiff") opposes the motions. (Docket Entry ## 17, 22, 32). After a hearing (Docket Entry # 49), this court took the motions (Docket Entry ## 10, 30) under advisement. Eight days later, plaintiff filed a motion for leave to amend the complaint (Docket Entry # 50), which defendant opposes based on futility, undue delay, and an unnecessary waste of resources (Docket Entry # 52).

Approximately two months later, this court held a hearing on the motion to amend and took the motion (Docket Entry # 50) under advisement.

<u>PROCEDURAL HISTORY</u>

The complaint raises the following, state law causes of action against defendant: (1) fraud (Count I); (2) intentional infliction of emotional distress ("IIED") (Count II); (3) negligent infliction of emotional distress (Count III); (4) violation of Massachusetts General Laws chapter 93A ("chapter 93A"), section nine (Count IV);[1] (5) intentional misrepresentation/deceit (Count V); (6) negligent misrepresentation (Count VI); (7) negligence (Count VII); and (8) injunctive relief (Count VIII).  (Docket Entry # 8-1).

Defendant moves to dismiss the complaint in its entirety (Docket Entry # 10), which plaintiff opposes (Docket Entry # 17).  With respect to the motion to amend, the proposed first amended complaint ("PFAC") seeks to add additional facts primarily to support the misrepresentation claims.  (Docket Entry # 51-1).  It does not add any new claims.

---

[1]  Although the complaint does not expressly identify section nine, it refers to a demand letter, which is not required to bring a section 11 claim.  (Docket Entry # 8-1, p. 10, ¶ 61). Plaintiff is also "a homemaker" who did not work "professionally outside of the family home."  (Docket Entry # 8-1, p. 5, ¶ 24). As an aside, page numbers in cited docket entries refer to the page number in the upper, right-hand corner of the docketed filing.

The preliminary injunction motion seeks to dissolve a preliminary injunction entered in Massachusetts Superior Court (Suffolk County) ("state court") prior to a removal to this court.  In the alternative, the motion requests that plaintiff post a bond and make security payments pursuant to Fed. R. Civ. P. 65(c).  (Docket Entry # 30).  The July 13, 2018 Order by the state court enjoined defendant from foreclosing on property located at 133 Beach Avenue in Hull, Massachusetts.  (Docket Entry # 31-3).

<u>STANDARD OF REVIEW</u>

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face" even if actual proof of the facts is improbable.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>Miller v. Town of Wenham, Mass.</u>, 833 F.3d 46, 51 (1st Cir. 2016).  The "standard is 'not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" <u>Saldivar v. Racine</u>, 818 F.3d 14, 18 (1st Cir. 2016) (internal citations omitted).

In evaluating a Rule 12(b)(6) motion, a court may consider "'official public records; . . . documents central to plaintiffs' claim; [and] . . . documents sufficiently referred to in the complaint.'"  <u>Freeman v. Town of Hudson</u>, 714 F.3d 29, 36 (1st Cir. 2013) (internal citation omitted).  A recorded deed

3

(Docket Entry # 11-1) and a recorded Beach Avenue Realty Trust document (Docket Entry # 11-2) attached to defendant's memorandum fall within one or more of these exceptions and are therefore part of the Rule 12(b)(6) record.  See id.; Giragosian v. Ryan, 547 F.3d 59, 65-66 (1st Cir. 2008) (court may consider documents relied on in complaint, public records, and other documents subject to judicial notice).

FACTUAL BACKGROUND

I.  Original Complaint

Plaintiff resides at 133 Beach Avenue in Hull ("the property").  (Docket Entry # 8-1, ¶ 1, p. 2).  Defendant is a successor of World Savings Bank, FSB ("WSB"), which, after a series of name changes, mergers, or acquisitions, is presently known as Wells Fargo Home Mortgage, a division of the bank. (Docket Entry # 8-1, p. 2, ¶ 4).

Plaintiff and her deceased husband, Joseph F. Mahoney ("JFM"), purchased the property as tenants by the entirety on December 1, 1972, for $28,450.  (Docket Entry # 8-1, p. 2, ¶ 7) (Docket Entry # 11-1, p. 2).  On November 28, 2000, plaintiff and JFM conveyed the property to the Beach Avenue Realty Trust with themselves as co-trustees of the trust.  (Docket Entry # 8-1, p. 2, ¶ 9).  On October 3, 2003, WSB granted JFM, individually, a mortgage ("the 2003 mortgage") on the property secured by a $450,000 note ("the 2003 note").  (Docket Entry #

4

8-1, pp. 2-3, ¶ 10) (Docket Entry # 8-1, pp. 28-29).  The 2003 mortgage defines the borrower as "Joseph F[.] Mahoney, A Married Man," and makes no reference to the Beach Avenue Realty Trust. JFM signed the mortgage simply as Joseph Mahoney.  (Docket Entry # 8-1, pp. 28-29).  Plaintiff, however, did not sign the 2003 mortgage, and a signature line with her name is crossed out. (Docket Entry # 8-1, pp. 2-3, ¶ 10) (Docket Entry # 8-1, p. 29).

On May 31, 2005, JFM applied to refinance the 2003 mortgage by taking out a new mortgage ("the 2005 mortgage") on the property, which he and plaintiff still owned as co-trustees, for the stated purpose in the application of receiving a "[r]educed [interest] [r]ate."  (Docket Entry # 8-1, p. 4, ¶ 17) (Docket Entry # 8-1, pp. 16-19).  Plaintiff did not sign either the application or the 2005 mortgage.  If asked to sign the application, "she would have known the application was fraudulent" and refused to sign it.  (Docket Entry # 8-1, p. 4, ¶ 19).  In addition to identifying the false purpose for the loan as reducing the interest rate (Docket Entry # 8-1, p. 4, ¶ 13, sent. 1, ¶ 17) (Docket Entry # 8-1, p. 16), the application lists JFM's assets as $2,901,000, including real estate valued at $1,800,000 and liabilities of $504,000.  (Docket Entry # 8-1, pp. 3-4, ¶¶ 12, 13, 17) (Docket Entry # 8-1, pp. 16-17).  It does not include account numbers or bank addressees for the enumerated assets and cryptically denotes $185,000 as

5

"Investments."  (Docket Entry # 8-1, p. 17).  The application
identifies JFM's base monthly employment income as $10,000.
(Docket Entry # 8-1, p. 3, ¶ 12) (Docket Entry # 8-1, p. 17).
WSB used a "stated income, stated assets" documentation program
that did not verify JFM's "income or assets during the loan
approval process."  (Docket Entry # 8-1, ¶ 30, p. 6).  JFM and
plaintiff's joint tax return for 2004 reports a total income of
$550.  (Docket Entry # 8-1, p. 21).  As indicated, the 2005
application is signed by JFM but not by plaintiff.  (Docket
Entry # 8-1, p. 18).  It discloses an interest rate of 6.07%,
the $610,000 loan, and cash to borrower of $107,000.  (Docket
Entry # 8-1, pp. 16, 18).

On June 16, 2005, JFM and plaintiff, as co-trustees of the
Beach Avenue Realty Trust, executed a quitclaim deed granting
the property to JFM in his individual capacity for one dollar.
(Docket Entry # 8-1, p. 37).  Plaintiff was not told why she was
directed to sign the deed.  (Docket Entry # 8-1, p. 5, ¶ 23).
On the same day, JFM signed the 2005 mortgage in his individual
capacity.  The 2005 mortgage reflects the transfer of the
property to WSB subject to the terms of the mortgage secured by
a note ("the 2005 note") in the amount of $610,000 with JFM as
the borrower and WSB as the lender.  (Docket Entry # 8-1, pp.
31-32).  Under the 2005 note, JFM promised to make biweekly
payments over a 30-year period to WSB and its successor or

assignees.[2]  (Docket Entry # 8-1, p. 31).  The 2005 mortgage
reflects the higher $610,000 amount of the 2005 note, and the
complaint states that "the payments to be paid on the new [2005]
mortgage note were **_greater_** than the amount of the payments to be
made under the existing [2003] note."  (Docket Entry # 8-1, p.
4, ¶ 17) (Docket Entry # 8-1, pp. 28, 31).

The 2005 mortgage was recorded in the Plymouth County
Registry of Deeds on June 17, 2005.  (Docket Entry # 8-1, p.
31).  The payments and, drawing reasonable inferences, the
interest rate were greater for the 2005 mortgage than the
payments and, drawing reasonable inferences, the interest rate
for the 2003 mortgage.  (Docket Entry # 8-1, pp. 4, 11, ¶ 13,
sent. 1, ¶¶ 17, 65) (Docket Entry # 8-1, pp. 16, 28, 31).  At
the time of the 2005 application, JFM was "seriously ill with
lung disease."  (Docket Entry # 8-1, p. 4, ¶ 15).  On July 20,
2005, WSB discharged the 2003 mortgage and recorded the
discharge in the Plymouth County Registry of Deeds a few days
later.  (Docket Entry # 8-1, p. 35).

On May 20, 2008, JFM died.  (Docket Entry # 8-1, p. 2, ¶
6).  Plaintiff "notified the Bank and/or its predecessor of" the
death and continued to make payments on the 2005 note until
approximately October 2010.  (Docket Entry # 8-1, pp. 5, 8, ¶¶

---

[2]  The Rule 12(b)(6) record does not include the 2003 or 2005
notes.

26, 38).  "Wachovia, a prior holder of the mortgage" for which defendant "is responsible," acknowledged JFM's death when it sent a letter on September 21, 2011, addressed to "the Estate of JFM Mahoney."  (Docket Entry # 8-1, pp. 5-6, ¶ 27).  Despite "the Bank being informed that" plaintiff was not an administratrix of JFM's estate, had not signed the 2005 mortgage, and did not wish to be contacted because she was "not well," the bank repeatedly contacted plaintiff.[3]  (Docket Entry # 8-1, p. 6, ¶ 28).  On an ongoing basis, the bank's representatives "called the plaintiff on scores of occasions asking for her husband," inquiring about the property, and "asking questions of a personal nature."  (Docket Entry # 8-1, p. 6, ¶ 28).  On one day, plaintiff received four telephone calls "from different representatives of the Bank."  (Docket Entry # 8-1, p. 6, ¶ 28).  The bank's communications caused plaintiff "to sustain mental and physical anguish" with symptoms including "headaches, nausea, difficulty sleeping, and tremulousness, and worry."  (Docket Entry # 8-1, p. 6, ¶ 29).

On May 11, 2017, and on "other dates," plaintiff's counsel contacted the bank in writing about the "defects in its 2005 mortgage application and processes."[4]  (Docket Entry # 8-1, p. 7,

---

[3]  The complaint does not provide dates regarding these communications.

[4]  The complaint does not identify these "other dates."

¶ 36).  The bank responded to these contacts in a series of letters from May to September 2017 repeatedly asking for more time to investigate the matter.  (Docket Entry # 8-1, pp. 7-8, ¶ 36) (Docket Entry # 8-1, pp. 39-47).  On July 31, 2017, defendant's counsel sent a certified letter addressed to JFM to inform him the 2005 mortgage loan was in default and "has been accelerated."  (Docket Entry # 8-1, p. 49).  The bank's letters and other actions by bank representatives served as "a ploy intended to provide time for the [b]ank's attorneys" to initiate the necessary steps to foreclose on the property.  (Docket Entry # 8-1, p. 8, ¶ 37).  The bank "published a notice calling for a foreclosure on July 19, 2018."  (Docket Entry # 8-1, p. 8, ¶ 38).

II.  Newly Added Facts in PFAC[5]

In addition to the facts in the original complaint, the PFAC sets out additional facts regarding the bank's interactions with JFM and plaintiff regarding the 2005 application and mortgage.  Specifically, WSB approached JFM "about entering into [the] new mortgage with the lower interest rate," and "a representative of WSB told [JFM] that, in order" to receive the

_____

[5]  The PFAC is summarized for purposes of evaluating the motion to amend.  The adjudication of the motion to dismiss is based solely on the allegations and reasonable inferences in the original complaint, the attached documents, and the aforementioned publicly recorded documents attached to defendant's memorandum.

"new mortgage with a lower interest rate, . . . his wife would have to convey to him her interest in the Beach Avenue property." (Docket Entry # 51-1, p. 4, ¶ 11). "By making" this statement and other "representations to [JFM]," WSB "intended that he would repeat them to [plaintiff] and that [plaintiff] would sign a deed conveying her interest in the Beach Avenue property to [JFM]." (Docket Entry # 51-1, p. 4, ¶ 12). "[JFM] did in fact repeat" WSB's representations to plaintiff that WSB would issue "him a mortgage with a lower interest rate if [plaintiff] signed a deed transferring her interest in the Beach Avenue property to him."[6] (Docket Entry # 51-1, p. 4, ¶ 13).

At the closing of the 2005 mortgage, WSB representatives "confirmed that the reason" for the new mortgage "was that it would have a lower interest rate than the 2003 mortgage, and that to complete the transaction, the bank required that [plaintiff] sign the deed conveying her interest in the property to [JFM]." (Docket Entry # 51-1, p. 6, ¶ 24). "Contrary to the representations of WSB to [JFM] and [plaintiff], the 2005 mortgage had a higher interest rate than the 2003 mortgage."

---

[6] The complaint states that "plaintiff was never told of the reason why she was directed to sign the [quitclaim] deed." (Docket Entry # 8-1, p. 5, ¶ 23). The PFAC includes this sentence but adds the word "actual" such that the sentence reads that "plaintiff was never told of the *actual* reason why she was directed to sign the [quitclaim] deed." (Docket Entry # 51-1, p. 6, ¶ 27) (emphasis added).

(Docket Entry # 51-1, pp. 6-7, ¶ 28).  WSB made these inaccurate or false representations that it would issue the 2005 mortgage with the lower interest rate in order to have plaintiff "sign away her title interest to the property" and "cure the title defect" regarding the 2003 mortgage.  (Docket Entry # 51-1, pp. 6-7, ¶¶ 28-29).  The Beach Avenue Realty Trust, rather than JFM individually, owned the property in 2003.  (Docket Entry # 51-1, p. 3, ¶¶ 9-10) (Docket Entry # 8-1, p. 2, ¶¶ 9-10).  JFM, however, signed the 2003 mortgage as an individual rather than as a co-trustee of the trust.  Plaintiff relied on the information regarding the lower interest rate by signing "away her interest in the property" to JFM.  (Docket Entry # 51-1, p. 7, ¶ 30).

DISCUSSION

I.   <u>Defendant's Motion to Dismiss</u>

A.   <u>Statute of Limitations</u>

Defendant moves to dismiss the claims of fraud (Count I), negligent misrepresentation (Count VI), negligence (Count VII), and intentional misrepresentation (Count V) as untimely under a three-year statute of limitations.[7]  (Docket Entry # 11, p. 6).  Defendant also moves to dismiss the chapter 93A claim relating

---

[7]  As later discussed, the negligence and negligent misrepresentation claims fail given the absence of a duty.  Accordingly, the timeliness of the negligence and the negligent misrepresentation claims is not addressed.

to the 2003 and 2005 mortgages (Count IV) as untimely under a
four-year statute of limitations.  (Docket Entry # 11, p. 6).

Defendant submits that the claims accrue "'at the time of
the plaintiff's injury.'"  (Docket Entry # 11, p. 6) (citing
Salois v. Dime Sav. Bank of N.Y., 128 F.3d 20, 25 (1st Cir.
1997)).  Quoting the complaint, defendant identifies two
injuries consisting of the bank allegedly causing plaintiff: (1)
"'to lose her ownership interest in the Property'" when she
signed the quitclaim deed "in June 2005"; and (2) to ultimately
"'be saddled with a mortgage she could not financially handle on
the death of her husband.'"  (Docket Entry # 11, p. 6) (quoting
Docket Entry # 8-1, p. 9, ¶ 42).[8]  Because plaintiff is presumed
to know the contents of a document she signed, i.e., the
quitclaim deed, defendant reasons that tolling does not apply
and the "claims are based on publicly recorded documents."[9]

_____

[8]  Elsewhere in the complaint, it similarly alleges that
defendant "caused the plaintiff to sustain harm, including but
not limited to the loss of her interest in the Property [and]
the imminent foreclosure on her primary residence."  (Docket
Entry # 8-1, p. 10, ¶ 60).
[9]  The publicly recorded documents defendant cites (Docket Entry
# 11, p. 7) are those attached to the complaint: the August 2000
conveyance of the property to the Beach Avenue Realty Trust; the
2003 mortgage; the 2005 mortgage; the June 2005 discharge of
2003 mortgage; and the June 2005 quitclaim deed (Docket Entry #
8-1, pp. 23-38).  These documents do not contain the interest
rate applicable to the 2005 note or the higher payments on that
loan.  The 2005 application attached to the complaint does not
reflect a registry stamp or otherwise indicate its public
filing.  (Docket Entry # 8-1, pp. 16-19).

(Docket Entry # 11, p. 7).  Defendant emphasizes that plaintiff's injury was not "'inherently unknowable'" because she signed the quitclaim deed conveying her interest to JFM in 2005, and the deed gave her knowledge or a reason to know that someone may have caused her injury.  (Docket Entry # 21, p. 2).  Relying on the discovery rule, plaintiff argues that the claims of fraud, negligence, negligent misrepresentation,[10] intentional misrepresentation, and chapter 93A are not untimely because the harm was inherently unknowable, and she did not know or have reason to know she may have been harmed.  (Docket Entry ## 17, 22).  Plaintiff additionally contends that defendant fraudulently concealed the cause of action under Massachusetts General Laws chapter 260, section 12.  (Docket Entry ## 17, 22).

The statute of limitations for fraudulent misrepresentation and intentional misrepresentation claims is three years.  Mass. Gen. Laws ch. 260, § 2A; see Pilalas v. Cadle Co., 695 F.3d 12, 14 (1st Cir. 2012) ("limitations period under [Massachusetts] state law is three years for fraud"); Stolzoff v. Waste Sys. Int'l, Inc., 792 N.E.2d 1031, 1038 (Mass. App. Ct. 2003) ("common-law torts of fraud and misrepresentation are subject to three-year statutes of limitations").  The statute of limitations for chapter 93A claims is four years.  Mass. Gen.

---

[10]  See footnote seven.

Laws ch. 260, § 5A; see Latson v. Plaza Home Mortg., Inc., 708
F.3d 324, 326 (1st Cir. 2013) ("limitations period for chapter
93A actions is four years from injury"); Pagliaroni v. Mastic
Home Exteriors, Inc., 310 F. Supp. 3d 274, 284 (D. Mass. 2018)
("[c]hapter 93A claim is governed by a four-year statute of
limitations").  Plaintiff filed the complaint in July 2018.
Absent tolling, the fraud and intentional misrepresentation are
untimely insofar as they began to accrue more than three years
earlier (July 2015) and the chapter 93A claim is untimely
insofar as it began to accrue more than four years earlier (July
2014).  With respect to a statute of limitations defense, a Rule
12(b)(6) dismissal is appropriate if the complaint and any other
properly considered document "'fails to "sketch a factual
predicate" that would' provide a basis for tolling the statute
of limitations."  Abdallah v. Bain Capital LLC, 752 F.3d 114,
119 (1st Cir. 2014) (internal citations omitted).

Absent application of the discovery rule or another basis
for tolling, "[a] cause of action in tort begins to accrue at
the time of injury."  Quinn v. Hewlett-Packard Financial Servs.
Co., Civil Action No. 18-10705-LTS, 2018 WL 6107071, at *4 (D.
Mass. Nov. 21, 2018).  Under the discovery rule, "a cause of
action accrues when the plaintiff discovers or with reasonable
diligence should have discovered that (1) he has suffered harm;
(2) his harm was caused by the conduct of another; and (3) the

14

defendant is the person who caused that harm." Harrington v. Costello, 7 N.E.3d 449, 455 (Mass. 2014); see also Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1028 (Mass. 2013) ("claim accrues and the statute of limitations clock commences when a plaintiff knows, or reasonably should have known, 'that [he] has been harmed or may have been harmed by the defendant's conduct'") (internal citation omitted); Doherty v. Admiral's Flagship Condo. Tr., 951 N.E.2d 936, 940 (Mass. App. Ct. 2011) ("cause of action accrues when 'an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury'") (internal citation omitted); accord Commonwealth v. Tradition (N. Am.) Inc., 71 N.E.3d 142, 149 (Mass. App. Ct. 2017); see, e.g., Softub, Inc. v. Mundial, Inc., 53 F. Supp. 3d 235, 257 (D. Mass. 2014) (refusing to toll statute of limitations for intentional misrepresentation claim because, although plaintiff buyer claimed it was unaware of misrepresentation, it had reason to believe defendant's representations of product quality could not be trusted).

With respect to the discovery rule, "a claim does not accrue as long as the underlying facts that give rise to it remain 'inherently unknowable,' a standard that is 'no different from, and is used interchangeably with, the "knew or should have known" standard.'" Mehmet Kahveci, P.C. v. Citizens Bank, N.A.,

Civil Action No. 18-10459-FDS, 2019 WL 343256, at *4 (D. Mass. Jan. 28, 2019) (internal citations omitted); accord Albrecht v. Clifford, 767 N.E.2d 42, 49 (Mass. 2002) ("'inherently unknowable' standard is no different from and is used interchangeably with the 'knew or should have known' standard") (internal citation omitted); see also Cruz v. Kazim, Case No. 18-cv-10589-DJC, 2020 WL 5370628, at *4 (D. Mass. Sept. 8, 2020) (under "discovery rule, the factual basis for the cause of action must have been 'inherently unknowable' at the time of the injury"); see, e.g., Rezende v. Ocwen Loan Servicing, LLC, 869 F.3d 40, 43 (1st Cir. 2017) (rejecting accrual of *mortgagor's* chapter 93A claim at time of 2013 default notice based on failure to send monthly statements between March and September 2010 because mortgagor signed 2010 loan modification requiring monthly payments and delays and default were therefore not "'inherently unknowable' harms"); In re Sheedy, 801 F.3d 12, 20 (1st Cir. 2015) (*mortgagor* should have known "upon receiving loan documents" at closing about inaccuracy of amounts listed in "Truth and Lending statement").[11]

A plaintiff is therefore "put on 'inquiry notice' where [the plaintiff] is informed of facts that would suggest to a reasonably prudent person in the same position that an injury

---

[11]  As noted below, plaintiff was not a mortgagor or borrower on the 2003 and 2005 mortgages or the 2003 and 2005 loans.

has been suffered as a result of the defendant's conduct."
Tradition (N. Am.) Inc., 71 N.E.3d at 150.  Thus, "the date when
a plaintiff discovers, or any earlier date when she should
reasonably have discovered, that she has been harmed or may have
been harmed by the defendant's conduct" determines when the
cause of action begins to accrue.  Bowen v. Eli Lilly & Co.,
Inc., 557 N.E.2d 739, 741 (Mass. 1990); In re Sheedy, 801 F.3d
at 20 (same); see Galgana v. Wells Fargo Bank, N.A., Civil
Action No. 17-10924-MLW, 2018 WL 1542055, at *3 (D. Mass. Mar.
29, 2018) (cause of action began accruing once plaintiff
*mortgagor* "'should reasonably have discovered' the harmful terms
of the loan").

Here, the complaint sketches a factual predicate setting
out a basis for tolling under the discovery rule.  The chapter
93A, intentional misrepresentation, and fraud claims are
premised on representations that the interest rate in the 2005
note was lower than the interest rate in "the existing [2003]
note" and/or the stated purpose of a reduced interest rate in
the 2005 application was false in the context of the greater
payments on the 2005 note than on the 2003 note.  (Docket Entry
# 8-1, p. 4, ¶ 17).  More specifically, Lori Stryker
("Stryker"), WSB's loan originator who prepared the 2005
application, set out the stated purpose for the 2005 loan as a
"reduced [interest] rate."  (Docket Entry # 8-1, p. 16) (Docket

Entry # 8-1, pp. 3-4, ¶¶ 11, 17).  Because she prepared the
application, she communicated that purpose to JFM, the mortgagor
and borrower.  The stated purpose, however, was false (Docket
Entry # 8-1, p. 4, ¶ 13, sent. 1) because the real reason was to
correct the defect in the 2003 mortgage to JFM in his individual
capacity as opposed to in his capacity as co-trustee.  (Docket
Entry # 8-1, pp. 2-5, ¶¶ 9-10, 17, 20, 22).  Stryker intended or
had reason to expect JFM would advise plaintiff about the
misrepresentations regarding the lower interest rate and the
need to have her transfer her interest in the property to JFM to
effectuate the loan with the lower interest rate.  (Docket Entry
# 8-1, p. 4, ¶¶ 17, 20).

      Plaintiff was not a party to the 2003 mortgage or the 2005
mortgage.  (Docket Entry # 8-1, pp. 2-5, ¶¶ 10, 21) (Docket
Entry # 8-1, pp. 28-29, 31-32).  She did not sign the 2005
application.  (Docket Entry # 8-1, p. 4, ¶ 19) (Docket Entry #
8-1, pp. 16-19).  She was not a mortgagor or borrower with
respect to the 2003 and 2005 mortgages and the 2003 and 2005
notes.  (Docket Entry # 8-1, pp. 2-5, ¶¶ 10, 21) (Docket Entry #
8-1, pp. 28-29, 31-32).  The only knowledge plaintiff had from
signing the quitclaim deed was that she no longer held an
interest in the Beach Avenue Realty Trust and that the bank
needed her to sign away her interest in the property to obtain
the lower interest rate.  See Salois v. Dime Sav. Bank of N.Y.,

FSB, 128 F.3d 20, 25 (1st Cir. 1997) ("one who signs a writing
that is designed to serve as a legal document . . . is presumed
to know its contents").  She did not know or have reason to know
at that time that the bank caused her injury of signing away her
interest as co-trustee because there was nothing to place her on
inquiry notice that the interest rate was not lower than the
interest rate in the 2003 note or that the payments on the 2005
note were greater than the payments on the 2003 note.  See
Albrecht, 767 N.E.2d at 49 ("'cause of action for deceit in the
sale of real estate accrues when a buyer learns of the
*mis*representation or when the buyer reasonably should have
learned of the *mis*representation'") (emphasis added and internal
citation omitted); cf. In re Sheedy, 801 F.3d at 20 (Sheedy, the
mortgagor, "tells us [the court] she knew at the time of the
2004 [refinancing] Transaction that her husband did not receive
the required disclosures").[12]

Furthermore, the publicly recorded 2003 and 2005 mortgages
did not include the interest rate applicable to the underlying
loans.  (Docket Entry # 8-1, pp. 28-29, 31-32).  Whereas JFM had
access to the 2005 loan documents as the mortgagor, plaintiff's
status as his spouse does not necessarily mean she had access to
the loan documents or an objective reason to examine them prior

---

[12]  Plaintiff makes no such concession.

to his death.  As a homemaker and mother to eight children, she lacked expertise and sophistication relative to mortgages and loans.[13]  (Docket Entry # 8-1, p. 5, ¶ 24); see generally In re Sheedy, 801 F.3d at 24 (questioning how real estate broker could reasonably rely on contradictory disclosures).  She was not the administratrix of her husband's estate, a position which would both allow access to his documents and render her review of them (including the 2003 and 2005 notes with the interest rates) more likely.  Although she made payments on the 2005 mortgage for two years following JFM's 2008 death, there is insufficient information in the complaint to show that she accompanied those payments with paperwork that would raise reasonable doubts regarding a higher interest rate for the 2005 note than the 2003 note or that she knew or reasonably should have known of the higher interest rate.[14]

The complaint additionally reflects that plaintiff's counsel wrote to the bank on May 11, 2017, "and [on] other dates" which it does not identify, "calling [the bank's] attention to defects in its 2005 mortgage application and processes."  (Docket Entry # 8-1, pp. 7-8, ¶ 36).  Notably, it is not clear when plaintiff retained counsel or when counsel

---

[13]  As to actual knowledge, she only "recently became aware of the [bank's] misconduct."  (Docket Entry # 8-1, p. 5, ¶ 25).
[14]  The Rule 12(b)(6) record does not include the invoices or documents regarding the payments.

contacted the bank by letter or otherwise, although discovery
may uncover these potentially material facts,[15] see Harry v.
Countrywide Home Loans, Inc., 902 F.3d 16, 18 (1st Cir. 2018)
(rejecting tolling argument and agreeing with district court
that plaintiffs "were represented by counsel" in 2011); Harry v.
Countrywide Home Loans, Inc., 219 F. Supp. 3d 228, 236 (D. Mass.
2016) (plaintiffs' representation by counsel in 2011
demonstrated plaintiffs "were then aware of possible claims";
"plaintiffs should have exercised due diligence by asking
defendants for documents related to the mortgage at that time"),
aff'd, 902 F.3d 16 (1st Cir. 2018), as well as other relevant
facts, such as whether counsel or plaintiff obtained or
attempted to obtain the loan documents from any of plaintiff's
eight children, who "gained an interest in the Property upon
their father's death."  (Docket Entry # 8-1, p. 4, ¶ 20).

---

[15] Letters in 2011, 2012, and 2013 submitted by plaintiff in a
binder during a September 9, 2019 hearing and accepted as chalks
fall outside the four corners of the complaint and the narrow
exceptions that allow consideration of documents extraneous to
the complaint.  See Ironshore Specialty Ins. Co. v. United
States, 871 F.3d 131, 135 (1st Cir. 2017) (listing exceptions).
In fact, during the hearing, defendant argued that "almost none"
of the documents in the binder is "pleaded" in "the complaint."
Defendant therefore waived any argument to the contrary,
including that the complaint sufficiently refers to these
letters.  See Coons v. Industrial Knife Co., Inc., 620 F.3d 38,
44 (1st Cir. 2010).  Accordingly, the 2011, 2012, and 2013
letters and a 2013 email submitted as chalks are not part of the
Rule 12(b)(6) record.  To state the obvious, these letters date
back more than three or four years before the July 2018 filing
of the complaint.

In sum, based on the discovery rule, the fraud, intentional misrepresentation, and origination chapter 93A claims are not subject to dismissal based on defendant's statute of limitations argument.  It is therefore not necessary to address the alternative fraudulent concealment tolling raised by plaintiff.

B.  IIED

Defendant moves to dismiss the IIED claim (Count II) because the telephone calls and letters plaintiff received from defendant's representatives were not "extreme and outrageous conduct."  (Docket Entry # 11, pp. 13-15).  Plaintiff responds that harassing debt collection practices may constitute "'extreme and outrageous'" conduct.  (Docket Entry # 17).

To establish an IIED claim, a plaintiff must demonstrate:

1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

Madison v. Cruz, 390 F. Supp. 3d 191, 200 (D. Mass. 2019) (citing Agis v. Howard Johnson, Co., 355 N.E.2d 315, 318-19 (Mass. 1976)).  "Liability for 'extreme and outrageous' conduct 'cannot be predicated upon "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."'"  Roman

v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012)
(internal citations omitted).

Repeatedly mentioning a deceased spouse is not "'extreme
and outrageous'" enough to support an IIED claim.  See Brown v.
Hearst Corp., 54 F.3d 21, 26-27 (1st Cir. 1995) (news coverage
insinuating that plaintiff murdered his deceased spouse was
distressing but not "'extreme and outrageous'" enough to support
IIED claim).  Telephone calls and foreclosure warnings are also
deficient.  See Tak Lo v. JPMorgan Chase Bank, N.A., No. 15-cv-
40165-FDS, 2016 WL 3017383, at *5 (D. Mass. May 24, 2016)
(dismissing IIED claims against bank because "foreclosures, even
ones that may involve improper conduct, cannot readily be called
'utterly intolerable in a civilized community'") (internal
citation omitted).  Overall, the facts in the complaint
considered in their entirety do not set out a plausible basis of
"'extreme and outrageous [conduct] beyond all possible bounds of
decency.'"  Madison, 390 F. Supp. 3d at 200 (internal citation
omitted).  The IIED claim is therefore subject to dismissal.

C.   Negligence Claims

Defendant next moves to dismiss the claims for negligent
infliction of emotional distress (Count III), negligent
misrepresentation (Count VI), and negligence (Count VII) because
defendant does not owe plaintiff a duty of care.  (Docket Entry
# 11, pp. 17-18).  Plaintiff contends that duty of care is

23

interpreted broadly as "all persons have a duty not to engage in harassment which, intentionally or negligently, results in emotional harm to others."  (Docket Entry # 17, pp. 16-17).

Claims of negligence, negligent misrepresentation, and negligent infliction of emotional distress require the defendant to owe the plaintiff a duty of care.  See Wofse v. Horn, Civil Action No. 19-12396-WGY, 2021 WL 797809, at *8 (D. Mass. Mar. 2, 2021) (recognizing that duty is an element of negligent infliction of emotional distress claim under Massachusetts law); Whelden v. U.S. Bank Nat'l Ass'n, Civil Action No. 20-CV-10177, 2020 WL 6048731, at *2 (D. Mass. Oct. 13, 2020) ("[p]laintiffs' failure to show that defendants owed them a duty of care" precludes "negligent infliction of emotional distress" claim); Lockwood v. Madeiros, Civil Action No. 4:18-cv-40143-DHH, 2018 WL 4087938, at *8 (D. Mass. Aug. 27, 2018) ("'negligence in the context of an emotional distress claim requires that the defendant have owed plaintiff a duty of care that was breached in some way'") (internal citations omitted); Reedy v. NOVAD Mgmt. Consulting, LLC, Civil Action No. 18-10998-FDS, 2018 WL 3370627, at *3 (D. Mass. July 9, 2018) ("[t]o state a claim for negligence, plaintiff must allege that defendant owed plaintiff a duty of reasonable care").  "The relationship between a borrower and lender does not give rise to a duty of care under Massachusetts law."  MacKenzie v. Flagstar Bank, FSB, 738 F.3d

486, 495 (1st Cir. 2013); Gozzo v. Wells Fargo Bank, NA, Civil
Action No. 16-10499-LTS, 2017 WL 1075071, at *2 (D. Mass. Mar.
21, 2017) (plaintiff's assertion that defendant owed plaintiff
"'a duty not to proceed with a mortgage arrangement . . . likely
to result in default'" is "insufficient and devoid of any legal
justification suggesting the duty of care existed") (internal
citation omitted); Sullivan v. The Bank of N.Y. Mellon Corp., 91
F. Supp. 3d 154, 175-176 (D. Mass. 2015) (dismissing borrower's
claims of negligence and negligent infliction of emotional
distress for failure to state a claim because bank owed borrower
no duty of care under Massachusetts law); see also Reedy, 2018
WL 3370627, at *2-4 ("mere existence of a relationship between a
servicer and a borrower does not appear to create any additional
obligations," and therefore no common-law duty owed by loan
servicer to borrower to support negligence and negligent
infliction of emotional distress claims).

    Here, plaintiff's contact with defendant concerned mortgage
payments during the two-year period after JFM's death.  (Docket
Entry # 8-1, p. 5, ¶ 26).  Plaintiff is not a borrower and did
not sign either the 2003 or the 2005 mortgage.  (Docket Entry #
8-1, pp. 28-29, 31-32).  As there would have been no duty of
care even if she had been the borrower under Massachusetts law,
there is similarly no duty of care here to support the claims of
negligence, negligent misrepresentation, and negligent

infliction of emotional distress.  Accordingly, counts III, VI, and VII are subject to dismissal.[16]

D.  Chapter 93A

Defendant asserts that the chapter 93A claim fails because the conduct alleged was not "'unfair or deceptive,'" plaintiff fails to allege any actionable injury resulting from defendant's communications, and the claim is based on a false premise that the bank acted improperly by contacting her regarding the 2005 loan.  (Docket Entry # 11, pp. 2, 12-13, 15-17) (Docket Entry # 21, pp. 4-9).  Plaintiff disagrees. (Docket Entry ## 17, 22).

Chapter 93A provides a cause of action for a person "'who has been injured by another person's use or employment of any method, act or practice declared to be unlawful'" under the statute.  Hershenow v. Enter. Rent-A-Car Co. of Bos., Inc., 840 N.E.2d 526, 532 (Mass. 2006) (internal citation omitted); Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 253 (1st Cir. 2010) ("[c]hapter 93A provides a cause of action for a plaintiff who has been injured by unfair or deceptive acts or practices") (internal citations and quotations marks omitted).  To prevail on a chapter 93A claim, the plaintiff must show:

> first, that the defendant has committed an unfair or
> deceptive act or practice; second, that the unfair or

---

[16]  It is therefore not necessary to address the bank's other arguments to dismiss these claims.

deceptive act or practice occurred "in the conduct of any trade or commerce;" third, that the plaintiff suffered an injury; and fourth, that the defendant's unfair or deceptive conduct was a cause of the injury.

Rafferty v. Merck & Co., Inc., 92 N.E.3d 1205, 1222 (Mass. 2018) (internal citation omitted); see Morris v. BAC Home Loans Servicing, L.P., 775 F. Supp. 2d 255, 258-59 (D. Mass. 2011) (plaintiff "'must prove that a person who is engaged in trade or business committed an unfair or deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a result'") (internal citations omitted).

"What constitutes an unfair or deceptive practice requires an individualized, 'fact-specific' inquiry." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 358 (1st Cir. 2013) (internal citation omitted). Massachusetts courts ordinarily apply a "'a three-step analysis'" when determining whether a practice is unfair. Nickerson-Reti v. Bank of America, N.A., Civil Action No. 13-12316-FDS, 2018 WL 2271013, at *17 (D. Mass. May 17, 2018), appeal filed, (1st Cir. Sept. 14, 2019) (No. 19-1912) (internal citations and quotation marks omitted); accord In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d 20, 93-94 (D. Mass. 2007). More specifically, Massachusetts courts consider:

> (1) whether the practice is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it

causes substantial injury to consumers.

Nickerson-Reti, 2018 WL 2271013, at *17 (internal citations and quotation marks omitted).  "Conduct may be considered deceptive when it has 'the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted.'"  Saade v. Wilmington Sav. Fund Soc'y, Civil Action No. 16-cv-11982-IT, 2017 WL 4278395, at *6 (D. Mass. Sept. 26, 2017) (quoting Foley v. Wells Fargo, N.A., No. 13-cv-12107-LTS, 2017 WL 1591835, at *8 (D. Mass. May 1, 2017)) (brackets omitted).

The complaint segments two categories of conduct that give rise to the chapter 93A and other claims: conduct relating to defendant's false misrepresentations made to plaintiff in connection with the 2003 and 2005 mortgages (Docket Entry # 8-1, pp. 3-5, 10, ¶¶ 11-25); and conduct relating to defendant's ongoing communications with plaintiff about foreclosure (Docket Entry 8-1, pp. 5-6, 10, ¶¶ 26-29).  Defendant adheres to this format in seeking dismissal of the claims and denotes the former category as "[o]rigination [c]laims'" and the latter category as "'[c]ommunications [c]laims.'"  (Docket Entry # 11, pp. 2, 4, 12-13, 15-17).  This court follows suit with respect to the chapter 93A claim.[17]

---

[17]  Because the chapter 93A claim survives dismissal, there is no prejudice to plaintiff in proceeding in this manner.  This court

1.  Origination Chapter 93A Claim

Citing three cases[18] for the principle that a non-borrower
lacks standing to raise and enforce the rights of the borrower
on a mortgage loan, defendant maintains plaintiff lacks standing
to assert the origination chapter 93 claim.[19]  (Docket Entry #
11, p. 8) (Docket Entry # 21, pp. 4-7).  Defendant points out
that plaintiff was not a signatory on the mortgage or the note,
is not liable to pay the note, and is not the current owner of
the property.  (Docket Entry # 21, p. 6).

Quoting Standard Register Co. v. Bolton-Emerson, Inc., 649
N.E.2d 791, 795, (Mass. App. Ct. 1995), plaintiff submits that
privity is not required for a chapter 93A claim based on fraud.

---

expresses no opinion whether any future adjudication of the
chapter 93A claim will proceed in a similar fashion.

[18]  Dewayne v. First Nat'l Bank of Ariz., Civil Action No. 15-CV-
14245-IT, 2016 WL 6662678, at *2 (D. Mass. Nov. 10, 2016);
Anctil v. Specialized Loan Servicing, LLC, Civil Action No. 15-
14004, 2016 WL 70451, at *1 (D. Mass. Jan. 6, 2016); Ferreira v.
Mortg. Elec. Registration Sys., Inc., 794 F. Supp. 2d 297, 302-
03 (D. Mass. 2011).

[19]  In a reply brief, defendant raises an additional argument
tailored to the origination chapter 93A claim, namely, that
"there was no 'business relationship' between Plaintiff and
Wells Fargo related to the origination of the 2005 Mortgage Loan
that would support Chapter 93A claims related to the origination
of that loan."  (Docket Entry # 21, p. 5).  The argument is
waived.  See BioChemics, Inc. v. AXIS Reinsurance Co., 924 F.3d
633, 644 n.8 (1st Cir. 2019) (noting "fact that new arguments in
reply briefs are waived"); Sosa-Perez v. Sessions, 884 F.3d 74,
82 n.3 (1st Cir. 2018) (in "reply brief, Sosa relies extensively
on" recent cases that "BIA erred in denying her claim based on
kinship persecution" and, "[t]o the extent that this raises new
arguments, they are waived") (citation omitted).

(Docket Entry # 17, pp. 9-11) (Docket Entry # 22, pp. 4-5).  She additionally maintains that "a 93A/fraud claim concerning a mortgage" is permissible even though defendant's representative did not make the statements directly to plaintiff.  (Docket Entry # 22, pp. 4-5).  Although defendant raises the argument that the bank did not make misrepresentations *to her* in order to dismiss the fraud, intentional misrepresentation, and negligent misrepresentation claims (Docket Entry # 11, pp. 9-12), plaintiff addresses the argument in the context of both the fraud and the similar origination chapter 93A claims.  (Docket Entry # 17, pp. 11-13) (Docket Entry # 22, pp. 4-5).  In response, defendant asserts two arguments in the reply brief: (1) the origination chapter 93A claim requires plaintiff to allege defendant made the statements directly to her, which the cases plaintiff cites require when privity is lacking; and (2) "there was no 'business relationship' between Plaintiff and [the bank]."  (Docket Entry # 21, p. 5).

The second argument is waived.[20]  The first argument is addressed because it responds to an argument made by plaintiff, and it addresses the initial argument made by defendant regarding the fraud and intentional misrepresentation claims, which form the basis of the origination chapter 93A claim

---

[20] See the previous footnote.

(Docket Entry # 8-1, p. 10, ¶ 59).  See United States v. Bradstreet, 207 F.3d 76, 80 n.1 (1st Cir. 2000) ("While a reply brief is not the proper place to raise new arguments, it is proper for a court to look there for clarification.") (internal citations omitted).  In particular, the origination chapter 93A claim is based on "fraud, deceit, and outrageous conduct by the Bank."  (Docket Entry # 8-1, p. 10, ¶ 59).  For convenience and efficiency, this section of the opinion addresses defendant's same argument regarding the fraud and intentional misrepresentation claims as well as the origination chapter 93A claim.[21]

The complaint reasonably infers that plaintiff relinquished her ownership interest in the property based on the false representation that the 2005 mortgage and 2005 note would carry a lower interest rate than the 2003 mortgage and 2003 note.[22] (Docket Entry # 8-1, p. 3, ¶ 13, sent. 1, pp. 4-5, ¶¶ 17, 20, 22).  JFM, "68 years old" and "seriously ill" at the time, signed the application, which included the stated purpose of the loan as a reduced interest rate and the interest rate of 6.07%.

---

[21]  The negligent misrepresentation claim is already subject to dismissal for the independent reason regarding the lack of duty.
[22]  As explained in the factual background, the PFAC clarifies that contrary to the representations to JFM and plaintiff, "the 2005 mortgage had a higher interest rate than the 2003 mortgage."  (Docket Entry # 51-1, pp. 6-7, ¶ 28).  Separately, the 2005 application describes the loan as an "ARM," presumably an adjustable rate mortgage.  (Docket Entry # 8-1, p. 16).

(Docket Entry # 8-1, p. 4, ¶¶ 14-15).  Stryker, "a loan
originator for WSB, prepared [the] mortgage loan application"
for the property, then owned jointly by JFM and plaintiff as
"trustees of The Beach Avenue Realty Trust," and required
plaintiff "to sign away her interest in the Property to [JFM]"
in order for JFM to obtain the new loan purportedly with the
reduced interest rate.  (Docket Entry # 8-1, pp. 3-4, ¶¶ 11, 17,
20).  "The information that Stryker placed in the loan
application was false," including the purpose for the 2005 loan
and JFM's assets.  (Docket Entry # 8-1, pp. 3-4, ¶¶ 12-13, 17)
(Docket Entry # 8-1, p. 16).  The real reason was not to reduce
the interest rate.  (Docket Entry # 8-1, p. 5, ¶ 22).  Rather,
it was to cure the mistake in the 2003 mortgage, namely, JFM
executing the 2003 mortgage "in his individual capacity" as
opposed to "as co-trustee of The Beach Avenue Realty Trust."
(Docket Entry # 8-1, pp. 2, 5, ¶¶ 10, 22).

Turning to the standing and lack of privity arguments, the
Massachusetts Supreme Judicial Court ("SJC") describes "Chapter
93A claims as either tort-based, contract-based, or 'neither
wholly tortious nor wholly contractual in nature,' depending on
the circumstance."  Monks v. Astoria Bank, Civil Action No. 16-
12084-FDS, 2017 WL 2435278, at *4 (D. Mass. June 5, 2017)
(quoting Kraft Power Corp. v. Merrill, 981 N.E.2d 671, 683-684
(Mass. 2013) (quoting Kattar v. Demoulas, 739 N.E.2d 246, 256-57

(Mass. 2000)); see Commonwealth v. Fremont Inv. & Loan, 897
N.E.2d 548, 556 (Mass. 2008) ("[c]hapter 93A creates new
substantive rights and . . . 'mak[es] conduct unlawful which was
not unlawful under the common law or any prior statute'")
(internal citations omitted).  Here, the origination chapter 93A
claim is premised on fraudulent misrepresentations regarding the
lower interest rate and the reason for the 2005 loan as a
reduced interest rate in the context of the false
representations in the application regarding JFM's assets.
(Docket Entry # 8-1, pp. 3-4, ¶¶ 12-13, 17, 20).  Where, as
here, "a claim for a violation of Chapter 93A is based on a
false representation, . . ., the claim sounds in tort."  Monks,
2017 WL 2435278, at *4 (citing Standard Register, 649 N.E.2d at
794).  Notably, "[p]arties need not be in privity for their
actions to come within the reach of c. 93A."  Kattar, 739 N.E.2d
at 258.  The same principle applies to common law fraud or, by
analogy, the similar intentional misrepresentation.  See Baker
v. Zukor, No. 02-P-1701, 2004 WL 287361, at *1 (Mass. App. Ct.
Feb. 13, 2004) (finding "no merit to the defendant's contention
that absent an allegation of privity the plaintiff failed to
assert an actionable common law fraud theory") (unpublished).

     Contrary to defendant's argument that plaintiff lacks
standing, she is presenting a tort-based origination chapter 93
claim (Docket Entry # 8-1, p. 10, ¶ 59) (bank's actions

"constitute fraud, deceit, and outrageous conduct" in violation of chapter 93A) based on her relinquishment of her interest in the property via the execution of the quitclaim deed based on the false representation or intentional misrepresentation made by Stryker, namely, the false representation or intentional misrepresentation in the application to obtain a reduced interest rate for the 2005 mortgage.  (Docket Entry # 8-1, pp. 3-4, ¶ 11, 17, 20) (Docket Entry # 8-1, p. 16).  She therefore has standing to assert the origination chapter 93A claim.

The argument that neither the bank nor Stryker made the representation(s) directly to plaintiff is also not convincing. It is true that for plaintiff "to recover under Chapter 93A based on [her] claim of fraudulent misrepresentation, [she] must prove reasonable reliance" on the false statements.  Rodi v. S. New England Sch. of Law, 532 F.3d 11, 19 (1st Cir. 2008) (citing Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 243 (D. Mass. 1999), as "holding plaintiff could not recover under Chapter 93A for claim based on fraud where plaintiff failed to prove reliance on false statements was reasonable").  Likewise, as defendant points out (Docket Entry # 11, pp. 9-12), the intentional misrepresentation and fraud claims require reasonable or justifiable reliance.  Regarding the former claim, "[i]ntentional misrepresentation requires a finding that 1) defendant made a false representation of

material fact, 2) with knowledge of falsity, 3) for the purpose
of inducing plaintiff to act on this representation, 4)
plaintiff *justifiably relied* on the false representation and 5)
plaintiff suffered damage because of [plaintiff's] reliance."
Kahn, Litwin, Renza & Co., Ltd. v. EarthLink Bus., LLC, Civil
Action No. 16-11126-NMG, 2018 WL 11219452, at *5 (D. Mass. Oct.
15, 2018) (emphasis added) (citation omitted).  Regarding the
latter claim, "[r]easonable reliance" on the false
misrepresentation is "a necessary element of fraud."  Passatempo
v. McMenimen, 960 N.E.2d 275, 294 (Mass. 2012) (emphasis
omitted).

     Section 533 of the Restatement (Second) of Torts (1977),
however, dispels the contention that plaintiff's failure to
allege misrepresentations made to her is fatal to the
origination chapter 93A, fraud, and intentional
misrepresentations claims.  The section reads as follows:

> *The maker of a fraudulent misrepresentation is subject to
> liability* for pecuniary loss to another who acts in
> justifiable reliance upon it *if the misrepresentation,
> although not made directly to the other, is made to a third
> person and the maker* intends or *has reason to expect that
> its terms will be repeated or its substance communicated to
> the other, and that it will influence his conduct* in the
> transaction or type of transaction involved.

Id. § 533 (emphasis added); accord Sgarzi v. Sharkansky & Co.
LLP, No. 1384CV0351, 2016 WL 4080427, at *6 (Mass. Super. Ct.
June 15, 2016) (quoting Restatement (Second) of Torts § 533

(1977), in context of addressing fraud claim); <u>Ferola v. Allstate Life Ins. Co.</u>, 2007 WL 2705534, at *11 n.13 (Mass. Super. Ct. 2007) (collecting cases); <u>see</u> <u>Cahaly v. Benistar Prop. Exch. Tr. Co., Inc.</u>, 864 N.E.2d 548, 560 (Mass. App. Ct. 2007) (defendant's "direct personal contact with the plaintiffs was not a requirement for a finding of misrepresentation in this case").

Given these principles in the context of the facts set out in the complaint, the three cases cited by defendant[23] are distinguishable.  Examining those cases, the plaintiff in <u>Dewayne</u> obtained purported title to property owned by Leitta Brooks ("Brooks") when he obtained a quitclaim deed from Brooks in exchange for the work he performed on the property.  <u>Dewayne</u>, 2016 WL 6662678, at *1.  Before executing the quitclaim deed to the plaintiff, Brooks took out a loan secured by a mortgage on the property.  <u>Id.</u>  Defendant JP Morgan Chase Bank ("Chase"), the loan servicer and purported owner of the note and the mortgage, misrepresented the interest rate to Brooks by charging her a rate higher than the agreed rate by the parties at the time the loan originated.  <u>Id.</u> at *1-2.  The defendants, including Chase, did not make any misrepresentations to the plaintiff or, unlike the case at bar, any misrepresentations to

---

[23]  See footnote 18.

a third party which the defendants reasonably expected would be repeated to the plaintiff and influence her conduct in the loan transaction.  The court rejected the plaintiff's claims "[t]o the extent that Plaintiff seeks to vindicate" the rights of Brooks, the borrower, as opposed to his own rights.  Id. at *2 ("[p]laintiff may not bring a cause of action on behalf of another individual") (citing and quoting 28 U.S.C. § 1654 that "'parties may plead and conduct their own cases personally or by counsel'").  Here, in contrast, the facts and reasonable inferences in the complaint show that Stryker represented to JFM that plaintiff needed to relinquish her "ownership interest" in the property to him in order to obtain the loan with the reduced interest rate.  (Docket Entry # 8-1, p. 4, ¶¶ 17, 20).  It is reasonably expected that JFM would repeat these statements to his spouse, plaintiff, and they would influence her conduct, which they did because she "release[d] her interest in the Property to her husband by deed."  (Docket Entry # 8-1, pp. 4-4, ¶¶ 20-21).

The court in Anctil allowed a motion to dismiss a chapter 93A claim brought by Anctil to obtain a modification of a loan, which the defendant, the loan servicer, denied because plaintiff "was not a borrower" on the loan that he sought to modify. Anctil, 2016 WL 70451, at *1.  The chapter 93A claim involved the failure to give the loan modification rather than any

misrepresentation regarding the loan.[24]  Because Anctil was not a
signatory on the underlying loan, he "lack[ed] standing to
vindicate the rights of [the] borrower" to obtain the loan
modification.  Id.  Here, plaintiff is raising her own claim
based on misrepresentation(s) communicated to her husband which
Stryker reasonably expected JFM would repeat to plaintiff and
she would reasonably rely upon the misrepresentation(s) by
signing away her interest in the quitclaim deed.  A lack of
standing to obtain a HAMP modification on a loan which a non-
borrower did not sign, see id., differs from the standing of a
non-borrower regarding misrepresentations made to the borrower
which the defendant bank's representative (Stryker) reasonably
expected the borrower (JFM) would repeat to the non-borrower
(plaintiff).

The decision in Ferreira, 794 F. Supp. 2d 297 (D. Mass.
2011), is also distinguishable.  In Ferreira, a violation of a
Massachusetts statute, Mass. Gen. Laws ch. 140D ("chapter
140D"), "modeled after the Truth in Lending Act," 15 U.S.C. §
1601, formed the basis of the chapter 93A claim.  See Ferreira,

_____

[24]  The bank included "'several misrepresentations in the'"
application for the original loan "'relating to the assets and
income of'" the borrower, Anctil's ex-wife.  Anctil, 2016 WL
70451, at *1 (internal citation omitted).  Anctil was not
included on the loan because the mortgage broker advised them it
would increase the interest rate due to Anctil's "pending
bankruptcy."  Id. (internal citation omitted).

794 F. Supp. 2d at 302-303.  Both the chapter 140D claim and the chapter 93A claim based on chapter 140D sought rescission of the loan.  See id.  Section 10(a) of chapter 140D, however, only afforded the borrower/obligor a right to rescind the loan, and because the plaintiff was not the borrower, he lacked statutory standing.  Id. at 302-303.  The court therefore allowed summary judgment on the chapter 140D claim and the corresponding claim under chapter 93A.  Id. at 303.  Statutory standing under chapter 140D, however, does not equate to standing to raise a chapter 93A claim by a consumer based on misrepresentations by the bank to a third party, her husband, which the bank reasonably expected the husband would repeat to his spouse, plaintiff, and the misrepresentations would influence her conduct in the loan transaction.  Plaintiff's reasons to distinguish all three cases (Docket Entry # 17, pp. 10-11) likewise have merit.  In short, the origination chapter 93A claim presents a plausible claim, and defendant's arguments based on plaintiff's lack of standing and privity do not warrant dismissal.

2.  Communications Chapter 93A Claim

    Defendant seeks to dismiss the communications chapter 93A claim (Docket Entry # 8-1, pp. 5-6, 10, ¶¶ 26-29, 56-62) regarding the repeated telephone calls and purported harassment because plaintiff fails to plead an unfair or deceptive act or

practice.   (Docket Entry # 11).   Defendant also argues that the
communications chapter 93A claim alleges only "emotional
distress and allegedly resulting physical symptoms," and such
circumstances therefore require plaintiff to establish all of
the elements of an IIED claim, which she fails to accomplish.
(Docket Entry # 11, pp. 2, 17).   Regarding the first argument
and quoting Armata v. Target Corp., 99 N.E.3d 788, 792 (Mass.
2018), plaintiff submits that a per se violation of 940 Code
Mass. Regs. § 7.04(f) (2012) ("regulation 7.04") constitutes the
necessary unfair or deceptive act or practice.   (Docket Entry #
17, pp. 13-14).   As to the second argument, plaintiff contends
that the bank's harassing debt collection practices are
sufficiently extreme and outrageous to support an IIED claim and
a chapter 93A claim.

     "Massachusetts debt collection regulations," including
regulation 7.04 and 940 Code Mass. Regs. § 7.05(2) (2012)
("regulation 7.05(2)"), "were enacted pursuant to authority
granted to the Office of the Attorney General by Chapter 93A."
Nightingale v. Nat'l Grid USA Serv. Co., Inc., Civil Action No.
19-12341-NMG, 2020 WL 4506167, at *2 (D. Mass. Aug. 4, 2020).
Regulation 7.04 declares it "'an unfair or deceptive act or
practice for a creditor'" to contact a debtor by telephone at
his residence by initiating more than two telephone calls in
seven-day time period.   Armata, 99 N.E.3d at 792 (quoting

regulation 7.04).  Regulation 7.05(2) declares it "'an unfair or deceptive act or practice for a creditor to imply the fact of a debt, orally or in writing, to persons who reside in the household of a debtor, other than the debtor.'"  Id. at 797 (quoting regulation 7.05(2)) (underlining omitted).  The allegations in the complaint include the bank making "[a]s many as four calls . . . in one day" to plaintiff at the property. (Docket Entry # 8-1, pp. 5-6, ¶¶ 27-28).  As such, the complaint sufficiently pleads a plausible chapter 93A unfair or deceptive act or practice.[25]  See Nightingale, 2020 WL 4506167, at *2 (facts in complaint "that (1) Nightingale incurred a financial obligation to National Grid, (2) National Grid contracted with First Contact and iQor to place debt collection calls on its behalf and (3) between June 20 and June 23, 2018, the defendants placed more than two calls within a seven-day period . . . properly pled a Chapter 93A violation") (also discussing regulation 7.04(1)(f)); Harrington v. Wells Fargo Bank, N.A., Civil Action No. 19-11180-RGS, 2019 WL 3818299, at *3-4 (D. Mass. Aug. 14, 2019) (discussing regulation 7.04).

---

[25]  Defendant's related argument that there was nothing improper about contacting plaintiff to discuss voluntary payments in lieu of foreclosure "[g]iven her stated intention to keep the Property" and the bank's in rem rights to satisfy the 2005 note (Docket Entry # 11, pp. 12-13, 16-17) fails for the same reason.

Turning to defendant's second argument, a chapter 93A
plaintiff must suffer "a 'separate, identifiable harm arising
from the [regulatory] violation' that is distinct 'from the
claimed unfair or deceptive conduct itself.'"  Bellermann v.
Fitchburg Gas and Elec. Light Co., 54 N.E.3d 1106, 1111 (Mass.
2016) (quoting Tyler v. Michaels Stores, Inc., 984 N.E.2d 737,
745-46 (Mass. 2013)).  The showing further entails a causal
connection between the deception and the loss, including that
the loss was a foreseeable "'result of the deception.'"  Id.
(internal citation omitted).  Although courts struggle to
explain "what constitutes an injury under Chapter 93A," Shaulis
v. Nordstrom, Inc., 865 F.3d 1, 7 (1st Cir. 2017), the SJC notes
that an economic or noneconomic injury may suffice.  Bellermann,
54 N.E.3d at 1110 (chapter 93A's requirement that plaintiff
suffer "an injury may be met by showing either an economic or a
noneconomic injury"); accord Lee v. Conagra Brands, Inc., 958
F.3d 70, 80 (1st Cir. 2020) ("[t]o survive a motion to dismiss,
a Chapter 93A complaint must allege that the 'plaintiff suffered
an injury . . . by showing either an economic or a noneconomic
injury'") (quoting Bellermann, 54 N.E.3d at 1110) (ellipses
omitted); Nightingale, 2020 WL 4506167, at *3 ("non-economic
injuries may be legally cognizable under Chapter 93A"); see also
Hershenow, 840 N.E.2d at 535 (if defendant "invades a consumer's
legally protected interests, and if that invasion causes the

42

consumer a loss—whether that loss be economic or noneconomic—the consumer is entitled to redress under" chapter 93A).

The complaint reflects that, as a result of the scores of telephone calls by the bank and ongoing harassment, plaintiff sustained "mental and physical anguish, pain, and suffering, including causing her to suffer anxiousness, distress, upset, headaches, nausea, difficulty sleeping, tremulousness, and worry." (Docket Entry # 8-1, p. 6, ¶ 29). The complaint further notes that bank's representatives asked plaintiff "questions of a personal nature" thereby reasonably inferring she suffered harm consisting of an invasion of her personal privacy. (Docket Entry # 8-1, p. 6, ¶ 28). As to a causal connection, the complaint states that the bank's representatives knew of these effects "because they [were] told of the negative impacts" their conduct was having on plaintiff. (Docket Entry # 8-1, p. 6, ¶ 29).

Similar injuries suffice to plead a cognizable injury under chapter 93A. For example, allegations in a complaint "that Wells Fargo's debt collection calls caused" plaintiff to suffer the following injuries were sufficient to avoid a Rule 12(b)(6) dismissal: "(1) [plaintiff] 'suffered anger, anxiety, emotional distress, fear, frustration and embarrassment;' (2) the 'calls were distracting, an inconvenience, and an invasion of his personal privacy;' and (3) [plaintiff] 'wasted his time and

energy tending to the calls." Harrington, 2019 WL 3818299, at *4 (rejecting argument that complaint failed to plead cognizable injury under chapter 93A) (quoting complaint with ellipses and brackets omitted). In fact, "[c]ourts in this district" conclude "that anger, anxiety, emotional distress, fear, frustration, embarrassment, distraction and inconvenience may constitute separate, identifiable harm under Chapter 93A." Nightingale, 2020 WL 4506167, at *3 (citing Harrington, 2019 WL 3818299, at *4, and Niedzinski v. Cooper, No. 4:19-CV-40037-TSH, 2019 WL 4396806, at *7 (D. Mass. Aug. 14, 2019), *report and recommendation adopted sub nom.*, Niedzinski v. Nationstar Mort. LLC, 2019 WL 4396772 (Sept. 11, 2019)).

Moreover, the court in Harrington rejected an argument similar to the argument defendant makes, and the rejected argument cites the same cases relied upon by defendant (Docket Entry # 11, p. 17):

> Wells Fargo also argues that Harrington's emotional distress injury does not satisfy the requirements of Chapter 93A. Compare *Young v. Wells Fargo Bank, N.A.*, 109 F. Supp. 3d 387, 396 (D. Mass. 2015), *aff'd*, 828 F.3d 26 (1st Cir. 2016) ("Plaintiff must prove all the elements of intentional infliction of emotional distress ('IIED') in order to prevail on a 93A claim for emotional damages."), citing *Haddad v. Gonzalez*, 410 Mass. 855, 868 (1991) *with Wilson*, 86 Mass. App. Ct. 1109 n.4 (noting that "[t]he *Haddad* plaintiff explicitly claimed intentional infliction of emotional distress" and that "[r]ecent cases . . . suggest a more permissive approach to injury for purposes of c[h]. 93A"). But because the other alleged injuries are cognizable under Chapter 93A, the court need not reach this issue.

Harrington, 2019 WL 3818299, at *4 n.11.  Here, as in

Harrington, the complaint alleges more than emotional distress

injuries, including the injuries of invading plaintiff's

personal privacy.  Because the complaint includes actionable

injuries as opposed to only emotional damages, the

communications chapter 93A claim is not subject to dismissal for

failure to establish the elements of an IIED claim.

E.  Fraud and Intentional Misrepresentation Claims

Defendant seeks to dismiss the fraud and intentional

misrepresentation claims based on plaintiff's lack of standing

as a non-borrower to enforce the rights of the borrower.  For

reasons explained in Roman numeral I(D)(1), the argument does

not warrant a Rule 12(b)(6) dismissal of either claim.

Defendant also argues that plaintiff fails to allege any

misrepresentation made by WSB to her.  Here again, for reasons

explained in Roman numeral I(D)(1), defendant's argument that

the bank or its representatives, such as Stryker, did not make

the representation regarding the reduced interest rate directly

to plaintiff does not warrant a Rule 12(b)(6) dismissal of

either claim.

Defendant additionally contends that the complaint fails to

satisfy the heightened pleading standards of Fed. R. Civ. P.

9(b) ("Rule 9(b)") with respect to the fraud and intentional

misrepresentation claims.[26]  (Docket Entry # 11, pp. 11-12).
Rule 9(b) dictates that "[i]n alleging fraud or mistake, a party
must state with particularity the circumstances constituting
fraud or mistake."  Fed. R. Civ. P. 9(b).  With respect to
fraud, the particularity requirements "mandat[e] 'specifics
about the time, place, and content of the alleged false
representations.'"  Woods, 733 F.3d at 358 (quoting Juárez v.
Select Portfolio Servicing, Inc., 708 F.3d 269, 279-80 (1st Cir.
2013)).  The First Circuit in Woods considered a complaint
insufficient because, although it "include[d] a basic recitation
of the elements of fraud, [Woods did] not indicate when, where,
and how often the allegedly false statements were made or what,
specifically, was stated."  Id.  The complaint was also "wholly
silent on the issue of [Woods'] actual reliance."  Id.

The complaint satisfies Rule 9(b) because it identifies the
speaker, Stryker, and the false or misleading statement in the
application that the 2005 note would carry a reduced interest
rate consistent with the loan's purpose.  In fact, however, the
2005 note resulted in higher payments than "the existing [2003]
note."  (Docket Entry # 8-1, pp. 3-4, ¶¶ 11-14, 17, 20).  The
complaint also discloses the where (the application) and the

---

[26]  It is not necessary to address defendant's argument that the
negligent misrepresentation claim does not comply with Rule 9(b)
because the claim is subject to dismissal based on the absence
of a duty between plaintiff and the bank.

when (the May 31, 2005 date of the application) regarding the
false statement.  It depicts why the statement was false, i.e.,
JFM's 2004 tax return showed minimal income and payments on the
2005 note were higher than payments "under the existing [2003]
note."  (Docket Entry # 8-1, p. 4, ¶¶ 13, 17).  The complaint
further recites the undisclosed reason Stryker required
plaintiff "to sign away her interest in the Property to her
husband," namely, to cure the defect in the 2003 mortgage
executed by JFM "in his individual capacity" rather than in his
capacity as "co-trustee of The Beach Avenue Realty Trust."[27]
(Docket Entry # 8-1, pp. 2-5, ¶¶ 9-11, 17, 20, 22-23).
Notwithstanding defendant's argument to the contrary (Docket
Entry # 11, p. 11), the complaint adequately sets out the
scienter element because it is "reasonable to believe," Woods,
733 F.3d at 358, that Stryker knew the mortgage loan would not
carry a reduced interest rate because she prepared the
application and because "the payments to be paid on the new
[2005] mortgage note were greater" than the payments on the 2003
note (Docket Entry # 8-1, pp. 3-4, ¶¶ 11, 17).  See Woods, 733
F.3d at 758 (noting fraud claim "fails for lack of scienter"
under Rule 9(b) and citing case which states courts

---

[27]  The complaint qualifies this statement with language that
"[i]t appears" the bank's actions were "aimed at curing [the
defect]."  (Docket Entry # 8-1, p. 5, ¶ 22).

"'uniformly'" find "'complaint's general averment of the defendant's "knowledge" of material falsity'" inadequate, *unless* complaint has "'specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading'") (internal citation omitted).

Finally, although the complaint is deficient regarding the reliance element (Docket Entry # 8-1, p. 11, ¶ 68), defendant does not specifically complain about reliance, and the PFAC addresses and cures this deficiency.  (Docket Entry # 51-1, p. 7, ¶ 30).  As discussed below, amendment is appropriate as to the above, non-futile claims, i.e., the chapter 93A, fraud, and intentional misrepresentation claims.

II.  Motion to Amend

Plaintiff moves to amend the complaint by adding certain discrete facts to clarify the misrepresentations and plaintiff's reliance on those misrepresentations.  She does not seek to add any new legal claims and points out that discovery has not commenced and there is no scheduling order. (Docket Entry ## 50, 51, 55).  Defendant opposes amendment based on undue delay, futility, and an unnecessary waste of resources of the court and defendant.  (Docket Entry # 52).

BACKGROUND

To place the delay in seeking the amendment in context, this court turns to the procedural history, which begins when

plaintiff filed the complaint in state court on July 10, 2018. After defendant removed the action to this court, defendant filed the motion to dismiss on August 24, 2018.  On October 23, 2018, this court held a hearing on the motion to dismiss and denied the motion without prejudice to allow the parties six weeks "to attempt to resolve this matter."  (Docket Entry # 23). On November 28, 2018, defendant reported a termination of settlement discussions and renewed the motion to dismiss. (Docket Entry # 26).  In a status report filed the next day, plaintiff disagreed and expressed a belief that further negotiation might be fruitful.  (Docket Entry # 29).   On November 30, 2018, defendant filed the motion to dissolve the preliminary injunction and briefing ensued regarding this motion.  (Docket Entry ## 30, 31, 32, 38)

On January 23, 2019, this court convened a hearing on the motion to dismiss and the motion to dissolve the preliminary injunction.  During the hearing, the parties agreed to re-enter settlement talks, and this court therefore denied the motion to dismiss and the motion to dissolve the preliminary injunction without prejudice.  (Docket Entry # 39).  Discussions continued into the spring, and the parties filed additional status reports.  (Docket Entry ## 40, 42, 44).  On June 3, 2019, the parties jointly reported an inability to settle the case, and defendant requested a further hearing on the motion to dismiss.

49

(Docket Entry # 44).  Accordingly, this court set a hearing on the motion to dismiss as well as the motion to dissolve the preliminary injunction for July 15, 2019.  At the request of "all counsel," this court canceled the hearing on July 12, 2019. (Docket Entry # 46).  A few days later, this court rescheduled the hearing for September 9, 2019.

On September 9, 2019, this court heard argument on the motion to dismiss and the motion to dissolve the preliminary injunction and took the motions (Docket Entry ## 10, 30) under advisement.  Eight days later, plaintiff filed the motion to amend.  (Docket Entry # 50).  On November 14, 2019, this court held a hearing on the motion to amend and took the motion (Docket Entry # 50) under advisement.

<u>DISCUSSION</u>

As noted, defendant opposes amendment based on undue delay, futility, and the waste of the court and defendant's resources. This court considers the arguments seriatim.

A.  <u>Undue Delay</u>

"[U]ndue delay, on its own, may be enough to justify denying a motion for leave to amend."  <u>Hagerty ex rel. United States v. Cyberonics, Inc.</u>, 844 F.3d 26, 34 (1st Cir. 2016) (citing <u>Calderón-Serra v. Wilmington Trust Co.</u>, 715 F.3d 14, 20 (1st Cir. 2013)).  More specifically, "[a]ppreciable delay alone, in the absence of good reason for it, is enough to

50

justify denying a motion for leave to amend." Calderón-Serra, 715 F.3d at 20; see Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) ("protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for" court to deny amendment). In such cases, the party seeking amendment "has '[at the very least] the burden of showing some valid reason for his neglect and delay.'" Hagerty, 844 F.3d at 34 (quoting Perez v. Hosp. Damas, Inc., 769 F.3d 800, 802 (1st Cir. 2014) (quoting In re Lombardo, 755 F.3d 1, 3 (1st Cir. 2014)) (alteration in original). Moreover, in assessing whether the movant "carried this burden, courts must take into account 'what the plaintiff knew or should have known and what he did or should have done.'" Id. (internal citation and brackets omitted).

Here, although the delay between filing the complaint in July 2018 and filing the motion to amend in September 2019 is appreciable, see Lombardo, 755 F.3d at 3 (recognizing periods of 14, 15, and 17 months as "'considerable,'" which therefore places burden on movant to show "'"valid reason"'" for delay); Nikitine v. Wilmington Trust Co., 715 F.3d 388, 390-91 (1st Cir. 2013) (affirming denial of amendment when "plaintiff allowed nearly a year to elapse before seeking" amendment "and proffered no good reason for" delay), plaintiff correctly points out (Docket Entry # 55, p. 1) this is the first time she moved for

an amendment.  Cf. Calderón-Serra, 715 F.3d at 20 (affirming lower court's denial of amendment and lower court's recognition that plaintiffs previously amended their complaint).  Whereas she waited until after this court took the motion to dismiss under advisement, the time period spanned one week as opposed to the "many months after" the court took the "motions to dismiss . . . under advisement" in Calderón-Serra.  See id.

It is nevertheless true that the additional allegations are not new facts "'coming to light following discovery.'" Nikitine, 715 F.3d at 391 (quoting Villanueva v. United States, 662 F.3d 124, 127 (1st Cir. 2011)).  Plaintiff aptly points out, however, that the PFAC does not include additional legal theories.  It also is unlikely to cause a change in trial tactics.  See Steir, 383 F.3d at 12 (recognizing as "disfavored" motions to amend which prejudice "opposing party by 'requiring a re-opening of discovery . . ., significant postponement of the trial, and a likely major alteration in trial tactics and strategy'") (internal citation omitted); Carmona v. Toledo, 215 F.3d 124, 136 (1st Cir. 2000) (reversing denial of amendment while noting that claims "were pending since" inception of "litigation and no new legal theories are involved in the amendment").  Examining "the totality of the circumstances," Nikitine, 715 F.3d at 390, the lengthy period devoted to settlement talks lends context to the delay.  The delay *after*

plaintiff filed the motion to amend and this court took the motion under advisement in November 2019 is excusable as based on the actions of this court.  See Hagerty, 844 F.3d at 34-35. On balance and having considered any prejudice to defendant, the undue delay argument does not warrant a denial of the amendment.

B.  Futility

Where, as here, "a plaintiff seeks to amend her complaint prior to the commencement or completion of discovery," futility is measured "through the lens of Federal Rule of Civil Procedure 12(b)(6)."  Parker v. Landry, 935 F.3d 9, 13 (1st Cir. 2019); Rife v. One West Bank, F.S.B., 873 F.3d 17, 21 (1st Cir. 2017) ("'"[f]utility" means . . . complaint, as amended, would fail to state a claim upon which relief could be granted'") (internal citation omitted).  Accordingly, the proposed amendment in the case at bar "is futile if it fails to 'state a claim to relief that is plausible on its face.'"  Parker, 935 F.3d at 13 (quoting Twombly, 550 U.S. at 570).

Defendant submits the PFAC is futile because the "misrepresentation claims are time-barred" and the PFAC fails to add any allegations to show entitlement to tolling.  (Docket Entry # 52, p. 9).  For reasons already explained in Roman numeral I, the complaint sketches a factual predicate setting out a basis for tolling under the discovery rule with respect to the fraud, intentional misrepresentation, and origination

chapter 93A claims.  The PFAC includes all of the allegations in
the complaint and adds allegations which clarify what the
complaint already states or reasonably implies regarding the
misrepresentation concerning the reduced interest rate and
plaintiff's reliance on the representation.  In particular, the
new allegations elucidate that the bank's predecessor approached
JFM "about entering into a new mortgage with a lower interest
rate" and advised him that "his wife would have to convey to him
her interest in the Beach Avenue property" to obtain the
mortgage with the lower interest rate.  (Docket Entry # 51-1, p.
4, ¶ 11).  The bank intended JFM would repeat these statements
to plaintiff and that she would transfer the interest, which she
did.  (Docket Entry # 51-1, p. 4, ¶¶ 12-13).  At the closing,
the bank confirmed that the reason for the new mortgage was to
"have a lower interest rate than the 2003 mortgage."  (Docket
Entry # 51-1, p. 6, ¶ 24).  Contrary to the representation, "the
2005 mortgage had a higher interest rate than the 2003
mortgage."  (Docket Entry # 51-1, pp. 6-7, ¶ 28).  Plaintiff
relied on the false representation "because she signed the deed,
leaving her with no interest in the property," and she would not
"have signed away her interest in the property if she had known
that the bank would not issue her husband a mortgage with a
lower interest rate."  (Docket Entry # 51-1, p. 7, ¶ 30).

Defendant additionally maintains that a statement in the PFAC (Docket Entry # 51-1, p. 7, ¶ 30) ("When the last mortgage payment was made in 2010 it appears the interest rate was in excess of 7% with 374 of the remaining 479 payments carrying an interest rate in excess of 9.7%.") establishes "it was possible to determine the applicable interest rate" when plaintiff made her last payment in 2010.  (Docket Entry # 52, p. 10).  The "misrepresentation claims are, therefore, time-barred," according to defendant.  (Docket Entry # 52, p. 10).  The ability to discover this fact is not the equivalent of an event reasonably likely to put plaintiff on notice that someone may have caused her injury by misrepresenting the interest rate in the 2005 mortgage.  See Doherty, 951 N.E.2d at 940.  For reasons set out in Roman numeral I as well as those expressed by plaintiff (Docket Entry # 55, p. 3), the argument does not render the misrepresentation claims time barred.

Defendant additionally argues that the reasons the complaint is subject to a Rule 12(b)(6) dismissal apply to the claims in the PFAC and render them futile.  For reasons stated in Roman numeral I, the negligence, negligent misrepresentation, negligent infliction of emotional distress, and IIED claims are futile.  The new allegations do not cure the previously-described deficiencies in these claims.  Defendant's remaining

futility arguments regarding the other claims do not warrant denying amendment for reasons stated in Roman numeral I.

Defendant also points to a "direct contradiction" between the complaint and the PFAC to defeat amendment. (Docket Entry # 52, pp. 7-8). For reasons more fully articulated by plaintiff (Docket Entry # 55, pp., 2-3), she correctly explains it was not contradictory for the complaint to state she was not told "the reason why she was directed to sign the [quitclaim] deed conveying her interest in the Property to her husband" (Docket Entry # 8-1, p. 5, ¶ 23) and for the PFAC to clarify what the complaint already implies, namely, that she was not told "the *actual* reason why she was directed to sign the [quitclaim] deed" (Docket Entry # 51-1, p. 6, ¶ 27) (emphasis added).

In sum, the negligence, negligent infliction of emotional distress, negligent misrepresentation, and IIED claims in the PFAC are futile for the same reasons the corresponding claims in the complaint do not withstand the motion to dismiss. The remaining claims in the PFAC are not futile and undue delay does not warrant denying the motion to amend. Defendant's judicial and party resources argument (Docket Entry # 52, p. 11) is unavailing.

III.  Defendant's Motion to Dissolve Preliminary Injunction

Defendant seeks to dissolve the preliminary injunction issued by the state court prior to removal pursuant to Fed. R.

Civ. P. 60(b)(5) ("Rule 60(b)(5)") and Fed. R. Civ. P. 60(b)(4)
("Rule 60(b)(4)").  (Docket Entry ## 30, 31, 38).  In the
alternative, defendant requests that plaintiff "post a bond and
make security payments" in the amount of $1,500 if the
injunction remains in place.  (Docket Entry # 30) (Docket Entry
# 31, pp. 1, 15-16).  Defendant submits that the state court
erroneously granted the injunction because plaintiff "has no
likelihood of succeeding on her claims and the balance of
equities weighs in favor of dissolving the Injunction."  (Docket
Entry # 30) (Docket Entry # 31, p. 1).  Plaintiff maintains that
dissolution presents "extreme irreparable harm" of an "imminent
eviction" from the home in which she resides, she "has a
sufficient likelihood of success on the merits," and the balance
of the equities favors preserving the injunction.[28]  (Docket
Entry # 32, pp. 7-19).

Both parties set out arguments previously made in
connection with the motion to dismiss.  (Docket Entry # 31, pp.
5-14) (Docket Entry # 32, pp. 7-17).  They agree that if this
court allows the motion to dismiss, the preliminary injunction
is subject to dissolution "as there [is] no legal basis for its
maintenance."  (Docket Entry # 32, p. 5) (Docket Entry # 38, p.
3).  In light of this agreement, the remaining claims that

---

[28]  Defendant disagrees that eviction is imminent.  (Docket Entry
# 38, pp. 4-5).

support the injunction are those that survive the motion to dismiss, i.e., the chapter 93A, fraud, and intentional misrepresentation claims.

BACKGROUND

On July 10, 2018, plaintiff filed the complaint in state court and one day later filed an emergency motion for a preliminary injunction in light of a July 19, 2018 scheduled foreclosure.  (Docket Entry # 8-1, p. 1) (Docket Entry # 8-4, p. 1).  The latter filing included an affidavit by plaintiff which verifies much of the information in the unverified complaint. (Docket Entry # 8-4, pp. 71-74).  To support the preliminary injunction motion, plaintiff also filed the exhibits attached to the complaint, including the 2005 application, the 2003 and 2005 mortgages, the quitclaim deed, and the various letters in 2017 from the bank to plaintiff.  (Docket Entry # 8-4, pp. 38-41, 50-69).  The affidavit and these exhibits evidence the 2003 and 2005 mortgages, the amounts of the mortgage loans, the application with the 6.07% interest rate, and the quitclaim deed executed the same day as the 2005 mortgage.

Defendant, which had not obtained counsel at the time, did not appear at a July 13, 2018 hearing on the preliminary injunction motion.  On that date, the state court allowed the motion "for the reasons stated" (Docket Entry # 31-3) and issued a brief Order enjoining defendant from proceeding with the

scheduled foreclosure and staying the foreclosure until further court order (Docket Entry # 8-5).  The state court did not require plaintiff to post a bond or any other form of security. See generally Mass. R. Civ. P. 65(c) (requiring preliminary injunction applicant to give security absent "good cause shown").

In accordance with 28 U.S.C. § 1450, the injunction continued after defendant removed the action to this court.  28 U.S.C. § 1450 (state court injunctions issued before removal "remain in full force and effect until dissolved or modified by the district court").  After JFM died in 2008, plaintiff continued to make payments on the mortgage for approximately two years.  (Docket Entry # 8-4, p. 73, ¶¶ 13-14).  Plaintiff concurs with defendant that she "stopped making payments on the [2005] mortgage," and there is no indication that the bank received any payments after 2010 even though plaintiff continues to reside at the property.  (Docket Entry # 32, p. 7) (Docket Entry # 38, p. 5) (Docket Entry # 8-4, pp. 71, 73, ¶¶ 2, 14-15). The bank represents that it continues to pay taxes on the property.  (Docket Entry # 31, pp. 14-15) (Docket Entry # 38, p. 5).

## DISCUSSION

Defendant seeks to dissolve the injunction under either Rule 60(b)(4) or Rule 60(b)(5).  "A preliminary injunction is a

'judgment'" within the meaning of Rule 60(b).  Momenta Pharms.,
Inc. v. Amphastar Pharms., Inc., 834 F. Supp. 2d 29, 31 (D.
Mass. 2011).

Rule 60(b)(4) allows relief when "the judgment is void."
Fed. R. Civ. P. 60(b)(4).  A "'judgment is not void simply
because it is or may have been erroneous.'"  Carrasquillo-
Serrano v. Mun. of Canovanas, No. 18-1701, 2021 WL 941049, at *3
(1st Cir. Mar. 12, 2021) (internal citations omitted).  The July
2018 preliminary injunction Order does not fall into the limited
circumstances in which a judgment is void.  See id. (setting out
two instances in which judgment is void: lack of jurisdiction
and the issuing court exceeding its exercise of judicial power
in violation of Due Process Clause).

Turning to Rule 60(b)(5), it also provides a basis to
modify a preliminary injunction.  See Dr. José S. Belaval, Inc.
v. Peréz-Perdomo, 465 F.3d 33, 38 (1st Cir. 2006) (noting that
preliminary injunction is subject to modification "under the
usual criteria for such modifications," including Rule
60(b)(5)).  Under Rule 60(b)(5), defendant needs "to show that
'it is no longer equitable that the judgment should have
prospective application,' *and* that there has been the kind of
'significant change' in circumstances that the Rule requires."
Id. (internal citation omitted and emphasis added); see Concilio
de Salud Integral de Loiza, Inc. v. Peréz-Perdomo, 551 F.3d 10,

16 (1st Cir. 2008); accord Momenta, 834 F. Supp. 2d at 31 (Rule
60(b)(5) movant must "show it is no longer equitable that the
judgment should have prospective application and that there has
been a significant change in circumstances"); S. New England
Tel. Co. v. Global Naps, Inc., 620 F. Supp. 2d 152, 154 (D.
Mass. 2009) ("[i]n the First Circuit, a district court may
modify a preliminary injunction pursuant to Fed. R. Civ. P.
60(b)(5) where 'it is no longer equitable . . .' and there is a
'significant . . . change in operative fact'") (quoting Concilio
de Salud Integral de Loiza, 551 F.3d at 16).  Motions invoking
Rule 60(b) are "'granted sparingly.'"  Giroux v. Fed. Nat'l
Mortg. Ass'n, 810 F.3d 103, 106 (1st Cir. 2016).

    In the case at bar, defendant fails to show a significant
change in circumstances.  The preliminary injunction enjoined
the foreclosure and thus envisioned plaintiff continuing to
reside at the property.  In any event, defendant does not argue
a significant change in circumstances.  Rather, it relies on the
absence of a reasonable likelihood of success and the balance of
the equities.  Even accepting and considering the equities
asserted by defendant as true, they do not, in this court's
discretion, rise to the level of a significant change in
circumstances.  The alternative relief in the form of a bond
and/or security payment is, in substance and effect, a
modification of the preliminary injunction because the

preliminary injunction Order did not require a bond or security payments. The alternative relief therefore also requires a showing of a significant change of circumstances, which is lacking.

Although modifying the preliminary injunction is not appropriate, this case has been pending for more than two years. Accordingly, this court will entertain an abbreviated discovery period of a few months at the upcoming scheduling conference.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, the motion to dismiss (Docket Entry # 10) is **ALLOWED** in part and **DENIED** in part. The motion to amend (Docket Entry # 50) is **DENIED** as to the negligence, negligent misrepresentation, negligent infliction of emotional distress, and IIED claims in the PFAC and otherwise **ALLOWED**. The motion to dissolve the preliminary injunction or, in the alternative, to require plaintiff to post a bond and make security payments (Docket Entry # 30) is **DENIED**. This court will conduct a scheduling conference by telephone on April 6, 2021, at 2:15 p.m. to set an expedited discovery schedule.

                    /s/ Marianne B. Bowler
                    **MARIANNE B. BOWLER**
                    United States Magistrate Judge